LAW OFFICE OF BERNARD V. KLEINMAN, PLLC
By:    Bernard V. Kleinman, Esq.
       108 Village Square
       Suite 313
       Somers, NY 10589-2305
       Tel. 914.644.6660
       Fax 914.694.1647
       Email: *attrnylwyr@yahoo.com*
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
================================:
ROBERT LOFTUS,                  :
                Plaintiff,   :   Case No. 20-cv-
                                :
                                :
— versus —                      :   **COMPLAINT**
                                :
                                :
FINANCIAL INDUSTRY REGULATORY   :
AUTHORITY,                      :
                Defendant.   :
================================:

STATE OF NEW YORK}
COUNTY OF WESTCHESTER}       *s.s.*:

    Plaintiff, ROBERT LOFTUS, by and through his counsel of record, Bernard V. Kleinman, Esq., an attorney duly admitted to practice law before the Bar of this Court, respectfully alleges:

## NATURE OF PROCEEDINGS

    1. This is an action pursuant to the Securities Exchange Act, 15 U.S.C. § 78aa, proceeding brought by the Plaintiff, ROBERT LOFTUS ("Plaintiff") to challenge the Notice of Ineligibility for Arbitration by the Senior Case Specialist of the Respondent, FINANCIAL INDUSTRY REGULATORY AUTHORITY ("FINRA"), denying the Plaintiff the right to a hearing to determine his right to expungement of a previous FINRA finding.

2. On or about May 28, 2020, the Respondent, acting through its authorized agent, Senior Case Specialist, Christal Dolly, notified Plaintiff that

> your statement of claim are not eligible for arbitration. Therefore, pursuant to the Customer Code Rule 12203(a) or Industry Code Rule 13203(a), we decline to accept your claim.

See <u>Exhibit 1</u>.

3. No appeal procedure for a dismissal of a complaint when it is dismissed on these grounds.

4. As a result of the aforesaid Notice, Plaintiff LOFTUS is without further administrative recourse, and his request for expungement may not be addressed by the administrative entity (*i.e.*, FINRA) that had originally imposed the sanction being sought to be expunged.

5. It is the Plaintiff's position that he is entitled to a merits hearing and the argued subsequent expungement of the subject sanction by FINRA, as the denial of right was arbitrary and capricious, under the facts and law, and should, therefore, be vacated.

## THE PARTIES

6. Plaintiff is ROBERT LOFTUS, a resident of the County of New York, and State of New York.

7. Plaintiff is a licensed General Securities Representative, CRD No. 1357423.

8. Plaintiff's primary place of business is located at Arcadia Securities LLC, 1370 Avenue of the Americas, New York, NY 10019.

9. Plaintiff was issued his original Broker-Dealer License in September 1987.

10. The Respondent, FINANCIAL INDUSTRY REGULATORY AUTHORITY is chartered by Congress as the presiding authority over registered representatives and other securities personnel.  See 15 U.S.C. § 78o-3(i).

11. FINRA has its offices located at One Liberty Plaza, 165 Broadway, New York, NY 10006.

**JURISDICTION & VENUE**

12. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to Securities Exchange Act of 1934, 15 U.S.C. § 78aa(a), *et al*.

13. The incidents which give rise to this cause of action occurred within this jurisdiction, the Southern District of New York, and within three years of the filing of this Complaint.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), as amended by Section 311 of the Judicial Improvement Act of 1990, by reason of it being the location where all, or substantially all, of the events or omissions giving rise to the claims occurred.

**LEGAL ARGUMENT & THE FACTS APPLIED THERETO**

Procedural History

15. It is the position of the Plaintiff that his right to due process of law, was violated by the Defendant, and that the decision of the Defendant was arbitrary and capricious, and ignored both its own prior rulings, and mis-applied the subject cited FINRA Rules in denying the Plaintiff a hearing, and the ultimate expungement of its prior findings.

16. In or around 2013 the Department of Enforcement of FINRA commenced a proceeding as against the Plaintiff. *Department of Enforcement v. Robert Edward Loftus (CRD No. 1357423)*, Docket/Case No.: 2013037575801.

17. Following an arbitration proceeding, sanctions were imposed upon the Plaintiff based upon the following findings and conclusions, *viz*.,

> Without admitting or denying the allegations, Loftus consented to the sanctions and to the entry of findings that he engaged in check kiting by depositing checks that were drawn on his personal checking account into the brokerage account that he held with his member firm on three occasions when he knew or should have known that he lacked sufficient funds to cover the checks. The findings stated that Loftus deposited the worthless personal checks in order to benefit temporarily from the "float" on the checks (i.e., to derive the use and

benefit of the funds from the time they were credited to his account until other funds were deposited into the account), and, more specifically, to artificially inflate the balance in his firm account and prevent four checks that he had written against it from bouncing. The firm paid the four checks in reliance upon the artificially inflated balance in Loftus' firm account.

See Disclosure Event Details, Exhibit 2.

18. Following the actions by the FINRA Department of Enforcement, a separate FINRA full administrative arbitration was conducted involving the Plaintiff herein's challenge to his former employer's (Wells Fargo Advisors, LLC) refusal to abide by the terms of its contractual employment agreement with him. This separate FINRA arbitration proceeding took place on May 17, 19, 20, June 8, 16, 2016. See *Wells Fargo Advisors, LLC v. Loftus*, Case No. 13-02964.

Underlying Relevant Facts

19. Plaintiff LOFTUS, was first registered with FINRA as a General Securities Representative in or around January 1985. Between that time and the time he was employed with Wells Fargo Advisors LLC (hereinafter referred to as "Wells Fargo"), he worked for five other FINRA member firms. On or about July 2nd, 2013, Wells Fargo filed form U5, a Uniform Termination Notice for Securities Industry Registration, terminating LOFTUS from his position at Wells Fargo Advisors.

20. According to the formal complaint in the case at bar (as found justified following the agreement to settle all charges, on November 29, 2012) LOFTUS was advised by Wells Fargo that two checks he had written on his personal account (one for $5,105 and the other for $700) had been presented for collection, however his account had insufficient funds to cover the aforesaid checks. LOFTUS, notified of this negative balance, then deposited a check, in the amount of $6,000, drawn on his personal account, into the Wells Fargo account to cover the shortfall.

21. The FINRA Department of Enforcement allegation was that when LOFTUS deposited this $6,000 check he knew, or should have known, that he did not have sufficient funds in the payor account to cover the full amount of the $6,000 check.

22. On the basis of this deposit, Wells Fargo then paid the two checks above-referenced for $5,105 and $700.

23. On December 6th, 2012 — all of three business days later — LOFTUS deposited, by wire transfer, into his Wells Fargo account, funds sufficient to cover the negative balance.

24. On April 10th, 2013 (more than four months later) LOFTUS was advised that a personal check he had written for $1,267 had been presented against insufficient funds. In response to that notice LOFTUS deposited a check in the amount of $1,300 drawn on his personal checking account. That $1,300 check (showing only $100 available as of that date), as with the four month prior check of $6,000, was drawn on an account with insufficient funds, resulting in a return on the original check for $1,267.

25. The following day (*i.e.*, April 11th) LOFTUS corrected this by depositing cash from an account with adequate funds to cover the $1,267 check.

26. Several days later, on or about April 14th, 2013, LOFTUS received notice that a check he had written for $457 was being returned for insufficient funds. To clear that notice LOFTUS deposited a check, drawn on his personal account, in the amount of $500. This check was, unfortunately drawn on an account with inadequate funds. However, Wells Fargo, in reliance upon the $500 deposit paid the $457 check.

27. After being notified of the discrepancy, LOFTUS deposited cash, with sufficient funds to cover the $457 check.

28. The original complaint, as filed by the FINRA Department of Enforcement, was filed on or about July 15th, 2016. See Exhibit 3. The complaint alleged that Plaintiff LOFTUS, on all of three occasions between November 2012 and April 2013, had deposited checks, with insufficient funds, with his personal Wells Fargo account, and had then written checks on that account to cover

certain personal expenses.

29. Significantly, and it was argued before FINRA, for the purposes of the application for expungement, that all of these actions involved solely and exclusively <u>the personal accounts of the Plaintiff</u>. There was absolutely nothing involving any impact, whatsoever, on any customer or client accounts.

30. Following the filing of the formal complaint, an agreement was reached to settle all of the charges of the Department of Enforcement. See <u>Exhibit 2</u>.

31. While Plaintiff did not contest the final decision of the Arbitration panel (as this decision was reached following a full settlement agreement between Plaintiff LOFTUS and the Department of Enforcement), certain aspects of the case needed to be brought to the attention of FINRA for the purposes of the underlying application for expungement, which, as the denial of hearing rights makes clear, were never addressed.

32. First and perhaps foremost, is the fact that

> Without admitting or denying the allegations [in the formal complaint], Loftus consented to the sanctions and to the entry of findings that he engaged in check kiting . . .

See <u>Exhibit 2</u>.

33. While this statement is self-contradictory, the key element here is that LOFTUS (a) agreed to settle the matter to avoid the time and expense of a full adjudicative proceeding, and (b) was neither admitting nor denying the allegations. Significantly, and, as set forth below, LOFTUS does object to the characterization of the subject occurrences as "check kiting" with its attendant of the subject implications and ramifications as discussed *infra*.

34. As the facts as set forth both herein make clear, there was no intent to commit fraud, or to defraud LOFTUS' creditors. Indeed, (a) the fact that his practice had been previously ratified by Wells Fargo on multiple occasions in the past, (b) though there were three incidences referenced

in the complaint, they all were separated by sufficient dates and time that there was no element of LOFTUS making use of a "temporary clearance period", and (c) that he deposited funds either on the date of the NSF notice or immediately (within hours of the NSF notice) clearly demonstrate that he lacked the requisite intent to commit any fraud whatsoever.

35. Furthermore, as referenced above, on more than two dozen prior occasions Loftus had engaged in the subject activity that resulted in the particular charges herein. On all of those occasions, Wells Fargo covered the checks, as the claimant made full payment on the short funds within a matter of a day (or less), or a few days. During all of these occasions, Wells Fargo had no apparent issue of the Claimant's practices, and did not issue any NSF notices.

36. Additionally, on April 12, 2013, <u>after</u> the subject "offenses" had been committed Wells Fargo actually issued a formal statement regarding "Covering Non-Sufficient Funds Check Policy". See <u>Exhibit 4</u>. This Policy Statement made it clear that (a) any overdrawn check "that can be covered with margin will be paid", (b) "[i]f the available margin value is insufficient to cover the check, a notification will be generated . . .", and (c) "[c]heck deposits cannot be used to cover overdrafts due to the float required to collect on a check." It is hardly a coincidence that this Policy was issued the very day after Loftus made a deposit to cover the $1,267 check. It is, further, more than reasonable to draw from Wells Fargo's issuance of this Policy Statement, that it was drafted in direct response to the actions of the Plaintiff LOFTUS, and designed to cover their actions, as they had, as is referenced above, on more than two dozen prior occasions, permitted Loftus to act as he had, with no adverse consequences.

37. Indeed, at the FINRA arbitration hearing (involving the dispute between LOFTUS and Wells Fargo Advisors), Anthony Arico, who served as the branch manager for the Wells Fargo Advisors office where the Plaintiff was employed, while testifying regarding this Policy Statement

made the following comment, under oath,

> Q. Did you [*i.e.*, Anthony Arico] tell FINRA that somebody *in* your branch was accepting check deposits, when they shouldn't have?
> MS. GRANNUM: Same objection. CHAIRPERSON NORTHERN: Sustained.
> Q. In tab 86, you certainly didn't say that; correct?
> A. No.
> Q. Why not?
> A. I wasn't asked. . . .
> Q. Did you take any are you aware of any disciplinary action taken against anyone in your branch who was accepting check deposits to cover NSF action items?
> MS. GRANNUM: Objection . . . ***
> CHAIRPERSON NORTHERN: Sustained.
> Q. You understand, now having been through this, sitting here and listening to the testimony, that check deposits Mr. Loftus made check deposits on two occasions, in response to NSF action items; correct?
> A. I mean, I know he made several deposits. Are you talking about in the bank branch or the brokerage branch?
> Q. In the bank branch.
> A. Yeah, he made deposits in the bank branch to cover deposits.
> Q. And, you know somebody in the branch, not Mr. Loftus, authorized payments on checks because of those deposits; right?
> A. They responded to an action item, requesting that the checks be cleared.
> Q. Right. So should somebody have been doing that, based on check deposits?
> A. At the time, at the time you could deposit a check at a bank and if the deposit was made, we're operating under the assumption that it was a good check. Subsequent to that, now, we don't operate that way anymore.
> Q. So you're telling me this policy and this note here, were not in effect in March of 2013?
> A. I believe, of this policy, the difference is cash deposits you could deposit checks. . . .
> Q. Let me direct your attention to page two of this document. Do you see the last update date?
> A. Yeah.
> Q. It's April 12, 2013, does that refresh your recollection about whether this policy was in effect in 2013? Just not what they do, it's not their job.
> ***
> Q. Just to clarify then, the NSF action items and the response to those NSF action items, this is the policy covering that; correct?
> A. Correct.

FINRA Hearing, at pp. 1141-46.

38. As Arico testified, "at the time you could deposit a check at a bank and if the deposit was made, we're operating under the assumption that it was a good check." And, then he acknow-

ledged that the policy changed after LOFTUS had engaged in this conduct in 2013. "Subsequent to that, now, we don't operate that way anymore." *Ibid*. What this makes clear is that when Loftus engaged in the subject conduct his actions, and those of Wells Fargo, were completely sanctioned by the institution and the bank. And, it was only afterwards [*i.e.*, after the subject conduct] that a "new policy" was adopted precluding such future action. See <u>Exhibit 4</u>, Wells Fargo formal statement regarding "Covering Non-Sufficient Funds Check Policy", as issued April 12, 2013.

39. In other words, at the time that LOFTUS engaged in the penalized conduct it was <u>not</u> a "violation" of Wells Fargo policy. Only afterwards was it made a violation.

40. This transgression, it must be remembered never involved a customer or customer accounts. It was purely a personal matter involving the Plaintiff's personal banking accounts.

41. As a result of that sanction, for which the Plaintiff paid a $5,000 fine, and a three months suspension (imposed almost five years ago), the impact on the Plaintiff, and his ability to conduct his trade, has, in reality, been a lifetime sanction.

Legal Basis for Relief & Prayer for Relief

42. FINRA is a self-regulatory organization ("SRO") registered with the Securities Exchange Commission ("SEC") as a national securities association. See *Fiero v. Financial Indus. Regulatory Auth., Inc.*, 606 F. Supp.2d 500, 504 (S.D.N.Y. 2009), *rev'd on other grnds.* 660 F.3d 569 (2d Cir. 2011). "It is 'responsible for regulatory oversight of all securities firms that do business with the public; professional training, testing and licensing of registered persons; [and] arbitration and mediation . . . .'" *Sacks v. SEC*, 635 F.3d 1121, 1122 (9th Cir. 2011).

43. Under the Securities Exchange Act, one of FINRA's primary duties is to "establish and maintain a system for collecting and retaining registration information" about registered representatives such as Plaintiff LOFTUS. 15 U.S.C. § 78o-3(i)(1)(A). As part of FINRA's mandate,

it has the responsibility to "promulgate and enforce rules governing the conduct of its members." *Barbara v. New York Stock Exchange,* 99 F.3d 49, 51 (2d Cir. 1996) (*citing* 15 U.S.C. § 78f(b), 78s(g), discussing the role of an SRO).

44. In exercising its regulatory authority over members, the Securities Exchange Act also requires FINRA to "provide a <u>fair procedure for the disciplining of members</u>." 15 U.S.C. § 78*o*–3(b)(8). Emphasis added. See generally *Cody v. SEC*, 693 F.3d 251, 259 (1st Cir. 2012); *Todd & Co., Inc. v. SEC*, 557 F.2d 1008, 1012-14 (3d Cir. 1977). Further, because FINRA is a quasi-governmental agency, federal law subjects FINRA to extensive oversight. For example, "the SEC has . . . the responsibility to approve or reject any rule, practice, policy, or interpretation proposed by an SRO." *DL Capital Group, LLC v. Nasdaq Stock Market, Inc.,* 409 F.3d 93, 95 (2d Cir. 2005). See also 15 U.S.C. § 78s.

45. "Registration information" includes information about "disciplinary actions, regulatory, judicial, and arbitration proceedings." *Id.* § 78o-3(i)(5). The Central Registration Depository (*i.e.*, CRD) is the database that FINRA and the securities commissions of the fifty states developed to store, among other information, information about regulatory enforcement and arbitration actions taken against registered representatives and other securities personnel in accordance with its obligations assigned it by Congress.. See *Dailey v. Legg Mason Wood Walker, Inc.*, 2009 WL 4782151 at *3-*4 n.4 (W.D. Pa. Dec. 8, 2009) (noting that "FINRA rules require that any FINRA arbitration initiated against a representative be disclosed on her Form U-4, which is then filed with FINRA's Central Registration Depository").

46. To the extent FINRA has taken the position, as set forth in its denial of eligibility letter (<u>Exhibit 1</u>), that it does in fact have a duty to expunge, it has not pointed to any provision in the

Securities Exchange Act, or any rule or regulation thereunder, that suggests such a broad power to deny a regulated party the opportunity to have a merits ruling on a prayer for relief..

47. Indeed, there is no provision in the Securities Exchange Act, or rule or regulation thereunder, otherwise indicating that FINRA either has or does not have such a duty. There is nothing in the Act, rules, or regulations that provide substantive criteria as to when expungement is appropriate.

48. Furthermore, there is nothing in the Act, rules, or regulations that require a registered representative, such as the Plaintiff LOFTUS, to exhaust his administrative remedies first – *i.e.*, to seek expungement relief from FINRA first before being able to seek judicial review — even though he has done so.

49. While FINRA Rule 2080 addresses expungement, it only sets forth procedures, not a substantive duty.[1] Subsection (a) of the Rule simply states that "[m]embers or associated persons seeking to expunge information from the CRD system arising from disputes with customers must obtain an order from a court of competent jurisdiction directing such expungement . . . ." FINRA Rule 2080(a). Subsection (b) of the rule affords FINRA the ability to participate in the judicial proceeding.

50. Rather, what the Plaintiff seeks is a right to be heard, not a peremptory dismissal of his claim on an alleged basis of ineligibility to pursue such a claim.

51. Rule 2080(a), further, refers to a "court of competent jurisdiction", which this Court is.

---

[1] It should be noted that FINRA Rule 2080 deals only with requests to expunge a record dealing with a customer complaint. In the case at Bar, the record to be expunged has nothing to do, whatsoever with a customer complaint. Indeed, it makes no rational sense, whatsoever, that there exists a procedure to expunge a matter involving a registered representative's client or customer, but no procedure granting a fair hearing on a request, as in the case at Bar, to expunge a record arising from a party's own personal non-regulated activity.

52. There are numerous legal and factual bases for the Plaintiff to be granted the relief sought. First of all, the primary basis for the sanction was a claim that the LOFTUS was guilty of check kiting. However, for the purposes of the Cause of Action herein, and the previously filed request with FINRA for expungement, it is important to recognize that the term "check kiting" "is a loose concept meaning different things for different purposes". *United States v. Vysniauskas*, 593 Fed. App'x 518, 520 (6th Cir. 2015). As such, it follows that FINRA recognize that "check-kiting" has been defined as a "<u>schem[e]</u> to meet payment on the checks of one bank by drawing uncovered checks on another bank, . . ." *United States v. Broxmeyer*, 192 F.2d 230, 232 (2d Cir. 1951). See also *United States v. Yarmoluk*, 1997 WL 642564 at *6 (S.D.N.Y. 1997). The scheme, itself, is dependent not on a "one-off" situation where the check writer has written just <u>one check</u> with insufficient funds, but, rather, where "the kiter <u>continues writing new checks within the temporary clearance period</u>, the balances of his accounts are permanently inflated, resulting in an interest-free loan in the amount of the kited check." *United States v. Vysniauskas, supra,* 593 Fed. App'x at 520. Emphasis added.² Further, it being a "scheme", an essential element, as recognized by the courts, is that there be an actual intent to defraud one's creditors. See *In re Montgomery*, 123 B.R. 801, 807 (Bankr. Ct. M.D. Tenn. 1991) (collecting cases); *In re Clemente*, 15 B.R. 937, 941 (Bankr. Ct. N.D. Ohio 1981) (and cases cited therein).³ Yet, as the facts make clear there was no

---

² In *Williams v. United States*, 459 U.S. 279 (1982), the Supreme Court, after providing an example of a check-kiting scheme, spoke of it in terms of the check-kiter "repeating this <u>scheme</u>", as an essential element of the practice. *Id*. at 281 n. 1. Emphasis added.
  See also *In re Stinson Petroleum Co., Inc.*, 2011 WL 1398477 (Bankr. Ct. S.D. Miss. 2011).

³ FINRA Rule 2010, the basis for the Complaint provides as follows,
  2010. Standards of Commercial Honor and Principles of Trade
  A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade.
 Any sanction imposed under this rule has, as an element thereof, "ongoing and intentional" conduct. See *Saad v. SEC*, 718 F.3d 904, 910 (D.C. Cir. 2013). This proof of intent is singularly

fraud present in the actions of the Plaintiff.[4]

53. In the FINRA denial of review on the request for expungement, FINRA cited for authority Rule 12203(a). See Exhibit 1.

54. Rule 12203(a) provides as follows, *viz*.,

> (a) The Director may decline to permit the use of the FINRA arbitration forum if the Director determines that, given the purposes of FINRA and the intent of the Code, the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives. Only the Director may exercise the authority under this Rule.

55. These in nothing in this Rule that precludes review or adjudication or the granting of a merits hearing to a relevant party of a request for expungement of a FINRA imposed sanction.

56. Similarly, none of the amendments to this Rule (SR-FINRA-2015-034 eff. Dec. 20, 2015; SR-FINRA-2008-021 eff. Dec. 15, 2008; SR-NASD-2003-158 eff. April 16, 2007) make any reference, whatsoever, to the issue of a request for expungement by a relevant party, such as the Plaintiff herein.

57. And, the same is precisely true for the other cited authority, industry Code Rule 13203(a) — no lawful basis for the denial of any merits review save an arbitrary and capricious action on the part of FINRA.

---

absent from the demonstrated conduct of the Plaintiff. See also *North v. Smarsh, Inc.*, 160 F. Supp.3d 63 (D.D.C. 2013).

[4] Compare *Midwestern Cattle Marketing, L.L.C. v. Legend Bank, N.A.*, 2020 WL 1042246 (5th Cir. Mar. 5, 2020), where the Fifth Circuit Court of Appeals referenced the fact that "Legend's internal fraud detection devices generating repeated check-kiting warnings". *Id*. at *4. In the case at Bar, as stated above, there were no prior warnings generated or communicated to LOFTUS until the November 2012 incident, indicating Wells Fargo's, arguable, acquiescence and, indeed, ratification of, Loftus' conduct.

58. Here, the Plaintiff invokes the equity powers of the Court to grant him the procedural due process and fairness to which he is entitled, notwithstanding the vagaries of the FINRA dismissal of his pleading for expungement.

## CAUSE OF ACTION

59. Plaintiff repeats and re-iterates ¶¶ 1 through 58 as if set forth herein.

60. Pursuant to 15 U.S.C. § 78aa(a), this Court has jurisdiction to direct the Defendant to grant the Plaintiff a hearing on his complaint.

61. The refusal of FINRA to permit a merits review of the application for expungement is a denial of his rights under the Securities Exchange Act, and is a violation by the Defendant of its duties and obligation sunder both the Act and its own Rules.

62. The Plaintiff LOFTUS has suffered damages to his reputation and his ability to carry on his business as a registered Broker Dealer as a result of the refusal of FINRA to expunge the subject sanction.  This sanction as set forth in Plaintiff's CRD directly impacts his ability to conduct business, while the Plaintiff has behaved scrupulously and never engaged in any adverse conduct involving a client or a client's account.

63. On any merits review of the requested action from FINRA, the Plaintiff would prevail based upon the reasonableness of his request and the fundamental equities therein.

64. As such, the Plaintiff requests relief as set forth herein.

WHEREFORE, Plaintiff, ROBERT LOFTUS, by and through his attorney of record, respectfully request judgment as follows,

    (a) In favor of Plaintiff and against Defendant;

    (b) Directing FINRA, the Defendant, to expunge the subject record and sanction;

(c) or, in the alternative, Directing the Defendant FINRA to grant the Plaintiff a Hearing to determine whether expungement is proper under the circumstances;

(d) Award of Attorney fees, and costs and disbursements; and,

(e) For such other and further relief as this Court shall deem just, proper and equitable.

> By his Attorney:
> LAW OFFICE OF BERNARD V. KLEINMAN, PLLC
>
>
> By /s/ *Bernard V. Kleinman*
> Bernard V. Kleinman, Esq.
> 108 Village Square
> Suite 313
> Somers, NY 10589-2305
> Tel. 914.644.6660
> Fax 914.694.1647
> *attrnylwyr@yahoo.com*

Dated: ~~August 24, 2020~~   September 8, 2020